# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

HENLOPEN LANDING )
HOMEOWNERS ASSOCIATION, )
INC., )
     )
           Petitioner, )
     )
           v. ) C.A. No. 7229-VCG
     )
RUSSELL H. VESTER and JAKARA )
VESTER, )
     )
           Respondents, )
     )
_____ )
     )
RUSSELL H. VESTER and JAKARA )
VESTER, )
     )
           Counterclaim Plaintiffs, )
     )
           v. )
     )
HENLOPEN LANDING )
HOMEOWNERS ASSOCIATION, )
INC., and PREMIER PROPERTY & )
POOL MANAGEMENT, LLC, A/K/A )
PREMIER PROPERTY )
MANAGEMENT, )
     )
           Counterclaim Defendants. )

## <u>MEMORANDUM OPINION</u>

Date Submitted:  April 5, 2019
Date Decided:  August 1, 2019

Michael R. Smith, of THE SMITH FIRM, LLC, Seaford, Delaware, *Attorney for Petitioner Henlopen Landing Homeowners Association, Inc. and Counterclaim Defendant Premier Property & Pool Management, LLC*.

Richard H. Morse and Meghann O. Karasic, of COMMUNITY LEGAL AID SOCIETY, INC, Wilmington, Delaware, *Attorneys for Respondents*.

GLASSCOCK, Vice Chancellor

A court of equity is, fundamentally, a forum to address those agency problems arising where ownership and control of assets are separated. One such instance involves ownership of real property in restricted developments, where owners have ceded certain rights over use and development of realty via deed restrictions, as enforced by homeowners' associations. In twenty-odd years on the bench, I have tried many disputes between property owners and homeowners associations, testing the limits of the exercise of such enforcement. In nearly every such case, the homeowner believes she has been singled out for unfair and overbearing—even tyrannical—treatment by the associations. At times, this belief is vindicated; at other times, not.

The matter before me is of this ilk, but with a twist. This case was originally brought by the Henlopen Landing Homeowners Association, Inc. (the "Association") to enforce deed restrictions against the Plaintiffs Russell and JaKara Vester (together, the Vesters), who own a house in the Henlopen Landing development near Five Points, south of Lewes. The purported deed restriction violations have all been mooted during the course of the litigation, and the Association's only remaining claim is for a mootness fee, which I will address by separate opinion.

The remaining portion of the action is the Vesters' Amended Counterclaim. The twist is that the Vesters are an interracial couple with an autistic son, among

other children.  The Vesters contend that the actions of the Homeowners were motivated by animus against their race, their son's medical condition, and the fact that they had children, in violation of the Delaware and Federal Fair Housing Acts. Their Amended Counterclaim seeks relief solely under those Acts.

The matter was tried over one day.  This is my post-trial decision.  It is clear to me that the Vesters are sincere in their belief that they have been discriminated against for invidious reasons, in violation of the Fair Housing Acts.  It is also clear that some of the violations of deed restrictions alleged by the Association against the Vesters were picayune, and at least one action—excluding the Vester family from the use of the community pool as coercion to remedy unauthorized alteration of the Vester driveway—persisted long after the underlying issue was remedied, and to that extent was ultra vires and improper.  And I acknowledge that animus on racial, familial status, and disability grounds are among the evils that the Fair Housing Acts were created to remedy.  Nonetheless, I find that the Vesters failed to prove that the Association—or its property management agent, Defendant Premier Property & Pool Management, LLC, a/k/a Premier Property Management ("Premier")—acted for reasons of animus regarding the Vesters' race, familial status, or disability, so as to be liable under the Acts.  My reasoning follows.

1

# I. BACKGROUND

Counterclaim-Defendant Henlopen Landing Homeowners Association, Inc. initiated this litigation. However, trial was held to decide only the Counterclaim-Plaintiffs Russell and JaKara Vester's counterclaims to the Association's Petition. The facts that follow are only those relevant to those counterclaims, and were either stipulated by the parties or proven by a preponderance of the evidence at trial.

## A. *The Parties*

On November 11, 2010, the Counterclaim-Plaintiffs,[1] the Vesters, purchased a home in a housing development, Henlopen Landing, south of Lewes, Delaware.[2] The Vesters are married and are an interracial couple.[3] They have four children, one of whom, ZaKai, according to his mother, has autism, evidence of which was not established at trial, but was represented to (and accepted as true by) the Association as early as June 27, 2011.[4]

Petitioner and Counterclaim-Defendant Henlopen Landing Homeowners Association, Inc. is a non-profit Delaware corporation.[5] Henlopen Landing is

---

[1] The Vesters are also the Respondents to the initial Petition in this action.

[2] Amended Pretrial Stip. and Order [hereinafter, APTSO], ¶ II.1. All the following references to the APTSO are to Section II of the APTSO, unless otherwise specified.

[3] *Id.* ¶ 1.

[4] *Id.* ¶ 2; JX 11 (the Vesters' application for various property modifications, noting "our child has special needs"); JX 14 (the Henlopen Landing Architectural Review Board's approval of a heightened fence after "presentation from the Vesters regarding the needs of their child"); *see also* Crane Dep. 27:13–20.

[5] JX 26, Art. I, Definitions, "Association."

subject to the Declaration of Covenants, Conditions and Restrictions for Henlopen Landing (the "Declaration") and bylaws and regulations promulgated under that authority.[6] According to the parties, the Declaration empowers the Association to govern Henlopen Landing.[7]

Counterclaim-Defendant Premier Property & Pool Management, LLC was the property management company for the Association, at the relevant times to this litigation.[8]

*B. Administration of Henlopen Landing*

1. The Declaration

Property in the community of Henlopen Landing is subject to the Declaration. As the Declaration describes, the developer of Henlopen Landing established the Association for the purpose of, among other things, "maintaining and administering the Common Area; . . . administering and enforcing covenants, conditions and restrictions . . . ; [and] adopting and enforcing rules and regulations."[9] Furthermore, pursuant to the Declaration, the Association had the "power to provide, and shall provide . . . [e]stablish and operate the Henlopen Landing Architectural Board . . . ."[10]

---

[6] JX 26.
[7] *Id.* § 3.5.
[8] *See* JX 51.
[9] JX 26, § 3.5.
[10] *Id.* § 3.5.4.

3

The Henlopen Landing Architectural Board (the "ARB") was given the "exclusive jurisdiction over all original construction, modifications, additions or alterations made on or to all existing improvements . . ." in Henlopen Landing.[11] The Declaration specifically mentions "fence[s]" and "paving for driveways" as examples of structures that cannot "be erected, placed or altered" before review and written approval by the ARB.[12] The ARB was tasked with establishing "design and development guidelines and application and review procedures,"[13] but the ARB could "authorize variances for compliance with any of the provisions of [the standards] when circumstances . . . require . . . ."[14]

The Declaration itself contains certain limitations on the improvements that homeowners can make to their property in Henlopen Landing. Pertinent here is a provision on fences, according to which, "[f]ences, boundary walls, boundary line hedges and shrubberies shall be prohibited within the front yard area of the lots and *in general*, shall not be closer to the front of the lot than one-half (1/2) of the length of the side of the dwelling unit. The height of any such fence, boundary wall, boundary line hedge or shrubbery along the side of a unit shall not exceed four feet (4'-0")."[15] Fences were only permitted with "[p]rior written approval . . . from the

---

[11] *Id.* § 7.2.
[12] *Id.* § 7.6.1.
[13] *Id.* § 7.2.
[14] *Id.* § 7.5.
[15] *Id.* § 8.2.1 (emphasis added).

Henlopen Landing Architectural Board."[16]  Also pertinent is a provision regarding any action that "will affect drainage of stormwater."[17]  An application for such action needs "to include a certification of non-effect of said plans from a professional engineer licensed in the State of Delaware."[18]

The Declaration limits what homeowners can do to the common property of Henlopen Landing and provides that "[n]o person shall alter in any way any Common Area except with the written permission of the Developer or Association."[19]  The Declaration also includes limitations on activities on a homeowner's property, such as "Garbage/Trash Disposal."  According to the Declaration, the Developer or the Association were to establish "reasonable standards" for "garbage and trash receptacles or similar facilities."[20]  These "receptacles shall be placed only at the front of the dwelling in an enclosure approved by the Developer or [the Association] and placed adjacent to the driveway for the dwelling in a location approved by the Developer or Association."[21]  However, "[i]f an Owner does not have a receptacle or similar facility approved by

---

[16] *Id.* § 8.2.2.
[17] *Id.* § 7.3.
[18] *Id.*
[19] *Id.* § 8.26.
[20] *Id.* § 8.15.
[21] *Id.*

the Developer or Association, all garbage and trash must be kept in the Owner's garage . . . ."[22]

If a homeowner committed an infraction of the Association's published rules and regulations, or breached or was in default of any of the covenants or provisions of the Declaration, that homeowner's rights to use Henlopen Landing's common areas could be suspended.[23] If an infraction is singular and nonrecurring, suspension of rights cannot exceed ninety days, following "notice from the Board of Directors."[24] If an infraction is continuous or recurring, suspension, again following notice, could extend up to ninety days after the infraction ceases or is remedied.[25]

## 2. Enforcing of the Declaration and Bylaws

The Declaration permitted the Association to hire a property manager for Henlopen Landing.[26] Premier, as the property manager, issued notices to homeowners for violations of or non-compliance with the Declaration or promulgated bylaws.[27] It did so after conducting its own inspections or after receiving "credible" reports from other homeowners in the community.[28] However,

---

[22] *Id.*

[23] *Id.* § 4.1.2.

[24] *Id.* The "Board of Directors" is the board of directors of the Association, which governs the Association. *Id.*, Art. I, Definitions, "Board of Directors;" *id.* § 3.6 (determining the composition of the Board of Directors).

[25] *Id.* § 4.1.2.

[26] *Id.* § 3.8.

[27] *See, e.g.*, JX 6; JX 9.

[28] JX 9.

only the Association, and not Premier by itself, had the authority to suspend the right of homeowners to use Henlopen Landing's common areas in response to violations of the Declaration.[29] Premier also acted, generally, as a liaison between homeowners and the Association, and specifically between homeowners and the ARB.[30]

*C. The Vesters' Application for Architectural Modifications of their Property*

1. The Vesters' Requests

On June 27, 2011,[31] the Vesters submitted a request to the Architectural Review Board (the "ARB") for five architectural modifications to their property.[32] The Vesters requested that they be permitted to: (1) install an irrigation well; (2) install a gazebo; (3) install a driveway expansion; and, most relevant here, (4) install a six-foot-high fence that encompasses the side door of their garage.[33] With respect to the fence request, the Vesters indicated that they sought two exceptions to Section 8.2.1 of the Declaration, concerning fencing.[34] First, the Vesters asked to exceed the four foot height limit and build to a height of six feet because their "child has special needs" and "could easily climb a 4 foot fence."[35] Second, the Vesters asked to "fence

---

[29] JX 26, § 4.1.2; Trial Tr. 282:9–13 (Kimberly Rice).
[30] APSTO ¶ 43.
[31] *Id.* ¶ 2; JX 11 (The Vesters' request is dated June 24, 2011).
[32] APTSO ¶¶ 3, 4; s*ee also* JX 11.
[33] APTSO ¶¶ 3, 4; JX 11. The fence was considered to be two architectural modifications, as the Vesters sought both a height variation and a location variation.
[34] JX 11.
[35] *Id.*

7

more than 1/2 of [their] side yard where our door for entrance to the garage is located to allow [them] the ability to let [their] dog outside in inclement weather."[36]

With respect to the request to expand the driveway, the Vesters attached a "Contract Proposal and Receipt" from a contractor that performed asphalt paving; the proposal did not include any information on the grading or slope of the driveway.[37] Mrs. Vester also attended an ARB meeting on July 1, 2011, at which she presented the four requests to the ARB.[38]

Mrs. Vester testified that the reason provided in her request for extension of the fence to encompass the garage side door—to accommodate the family pet—was pretextual. According to Mrs. Vester, the fence location variance, like the height exception, was intended to accommodate her child, ZaKai's special needs, by allowing him access to the backyard through the garage.[39] Mrs. Vester testified that she worried that this real reason might be problematic for the ARB.[40] Mrs. Vester had discussed the matter with a neighbor who had a fence that enclosed her side door, and based on that conversation, Mrs. Vester decided to instead indicate that

---

[36] APTSO ¶ 42; JX 11.

[37] JX 11.

[38] Crane Dep. 19:12–20, 21:2–8; Trial Tr. 91:4–8 (JaKara Vester). In post-trial briefing, Mrs. Vester claims that she raised with the ARB, at this meeting, the importance of the fence encompassing the side door of her garage, as well as the height of the fence, as a safety factor for her special needs son. However, I find that her testimony does not support this. *See* Trial Tr. 97:14–98:12 (JaKara Vester).

[39] Trial Tr. 73:6–78:13 (JaKara Vester).

[40] *Id.* at 88:6–89:18, 89:23–90:2.

the fence location was for her pet (the same reason that Mrs. Vester testified her neighbor had given, resulting in approval of the variance).[41] The Vesters' home does have several other doors that lead to their backyard;[42] however, Mrs. Vester believed that enclosing the garage's side door was in the best interest of her special needs child, ZaKai.[43]

### 2. The Architectural Board's Decision

After Mrs. Vester presented her request in-person to the ARB, the Review Board met and made a decision on the Vesters' architectural modifications request.[44] On July 7, 2011, Premier e-mailed Mrs. Vester the ARB's decision.[45] The ARB approved the Vester's request for a six-foot-tall fence but denied the request to extend the fence far enough to enclose the Vesters' garage side door.[46] Regarding the fence requests, the ARB wrote, "[a]fter a presentation from the Vesters regarding the needs of their child, the Board decided to grant approval for a [fence] . . . totaling 6'. The case for hardship was established. As a condition of approval the fence cannot be more than 1/2 the way up the side of the house . . . ."[47]

---

[41] *Id.* at 86:9–89:18.
[42] *Id.* at 157:6–159:3.
[43] *Id.* at 159:18–166:9.
[44] Crane Dep. 34:8–13.
[45] APTSO ¶ 5.
[46] *Id.* ¶ 5; JX 14.
[47] JX 14.

The ARB approved several of the Vesters' other requests, including installation of a gazebo and installation of an irrigation well.[48] The ARB deferred decision on the Vester's' driveway extension request, and asked the Vesters to submit "a plan from the contractor indicating the slope of the driveway is interior not exterior."[49]

### 3. The Vesters' Attempt to Appeal the ARB's Decision on the Fence

After receiving the ARB's decisions, Mrs. Vester e-mailed Kate Roach of Premier on July 7, 2011.[50] Mrs. Vester asked that the ARB reconsider its decision on the location of the fence.[51] Mrs. Vester noted in the same e-mail that others in the community had received permission to build fences in similar locations "for the same reason [the Vesters had] requested;"[52] presumably, to allow their pets to go from garage to backyard. Again, this reason was pretextual. Mrs. Vester also asked that the ARB consider that a fence enclosing their side garage door would prevent others from tampering with the Vesters' sprinkler system controls and other vandalism.[53] Mrs. Vester, however, did not disclose in her written request for reconsideration her real reason for the fence extension, to accommodate her son's

---

[48] APTSO ¶ 4.
[49] *Id.*; JX 14.
[50] APTSO ¶ 6.
[51] *Id.*
[52] *Id.* ¶ 7.
[53] JX 15, at 4.

special needs.[54]  At least one home in Henlopen Landing has a fence that encloses the exterior side door of its garage.[55]

In regard to the driveway extension, Mrs. Vester wrote to Ms. Roach that "[u]pon closer review of the proposal from the asphalt company we see that they did specify grading and the extension is to conform to the existing driveway which should clarify that the grading and slope is in fact interior . . . I have also asked the contractor(s) if they could clarify this issue as well and all have stated that the proposal should make that clear and that they do not do 'grading plans.'"[56]

On the same day, Ms. Roach replied by e-mail to Mrs. Vester and wrote that she would direct Mrs. Vester's concerns to the ARB and that either she or the ARB would respond to Mrs. Vester.[57]  The practice at the time was for Premier to receive requests for the Association, including architectural modification requests made to the ARB, and prepare the requests for review by Association (and the ARB).[58]

On July 13, 2011, Mrs. Vester e-mailed Ms. Roach to follow-up on the request for the ARB to reconsider their decisions on the fence and driveway.[59]  Ms. Roach responded on July 14, 2011, writing "All has been approved."[60]

---

[54] *Id.*
[55] APTSO ¶¶ 11–15.
[56] See JX 13; JX 15.
[57] APTSO ¶ 8.
[58] *Id.* ¶ 43.
[59] JX 15, at 3.
[60] *Id.* at 2–3.

11

## 4. The Vesters Proceed with the Driveway Extension

The Vesters had sought and received a second proposal from the contractor set to perform the paving and modification of their driveway.[61] This second proposal indicated that the work would be conducted to conform to the "existing driveway grade. All the way to road."[62] However, it does not appear that Premier, or the ARB, received this second proposal from the Vesters before August 4, 2011,[63] the day on which the Vesters' driveway was modified.

The Vesters, however, believed they had the necessary approval from the ARB to proceed on all of their modifications, given Ms. Roach's July 14, 2011 e-mail stating, "All has been approved."[64] As a result, on August 4, 2011, the Vesters proceeded to alter their driveway.[65] An inspector for Premier was alerted to the alteration and stopped by the Vesters' home to discuss the driveway work being done that day.[66]

---

[61] JX 12.

[62] *Id.*

[63] The Counterclaim-Defendants questioned the document's authenticity, as well as its date (the second proposal is dated July 20, 2011 but the Vesters claim this was an error and the document was created on July 2, 2011). In any case, the Vesters failed to show that Premier and/or the ARB received this document prior to August 4, 2011 (or even prior to February 29, 2012). It is also, then, immaterial whether this second proposal would have been sufficient for the ARB to approve the driveway modification at that time.

[64] JX 15, at 3.

[65] APTSO ¶ 9. I note that there was conflicting testimony as to the extent of the interaction between Mrs. Vester and the Premier inspector, including, what, if anything, the inspector said to Mrs. Vester.

[66] *Id.* ¶ 10.

12

The Vesters completed their driveway alteration on August 4, 2011.[67] Prior to August 4, 2011, several homeowners in Henlopen Landing had altered their driveways without prior approval from the Association.[68] On August 22, 2011, the Association requested the opinion of an engineer on the driveway drainage in order to bring the Vesters' driveway into compliance.[69] Prior to August 22, 2011, the Association had never required a homeowner to provide the opinion of a professional engineer licensed in Delaware on storm water drainage when the homeowner proposed (or completed) a driveway alteration.[70] While the Declaration technically required such an opinion,[71] the ARB had, at most, instead requested a plan indicating slope from the contractor performing the work.[72] Again, however, the record does not show that the ARB had, by this point, received the second proposal of the Vesters' contractor indicating that the slope of the driveway would not be altered.

On August 24, 2012, almost a year after their driveway alteration, the Vesters provided the Association with the opinion of a professional engineer, which demonstrated that the drainage of the Vesters' driveway, as altered, would have no impact on the storm water management of Henlopen Landing.[73]

---

[67] *Id.* ¶ 9.
[68] *Id.* ¶¶ 24–28.
[69] *Id.* ¶ 31.
[70] *Id.* ¶ 31.
[71] JX 26, § 7.6.
[72] APTSO ¶¶ 29–30 (At least two driveway modifications were approved by Premier on behalf of the Association without the opinion of a professional engineer); JX 14.
[73] APTSO ¶ 37.

13

*D. The Vesters' Purported Violations*

### 1. Violations Other than Driveway Non-Compliance

#### a. Violations Alleged Before June 2011

Prior to submitting their application for architectural modifications in late-June 2011, the Vesters received a number of notices of non-compliance or violation of the Henlopen Landing bylaws.[74] Specifically, in April and May 2011, the Vesters received notices alleging violations of bylaws on street parking,[75] noise,[76] operating a business out of their home,[77] playground equipment,[78] and parking a commercial vehicle in their driveway.[79]

On May 22, 2011, Premier sent the Vesters a letter "concerning the series of citation letters [the Vesters had] received since [their] settlement in Henlopen Landing."[80] The letter acknowledged that one such citation letter was sent in error because Premier had applied the bylaw of a different community.[81] A citation regarding playground equipment was also issued in error, apparently by mistake of one of Premier's inspectors.[82] In apparent response to concerns that the Vesters had

---

[74] *See* JX 4; JX 6; JX 7.
[75] JX 4; JX 7.
[76] JX 6.
[77] *Id.*
[78] JX 9.
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*

14

raised to Premier over the series of citation letters, Premier explained in their letter that violation notices are issued in response to inspections or "credible report from a Board, Committee or Owner Member," but that in the future, Premier would first "attempt to reach the owner [subject to a potential violation notice] by phone if a citation is at all questionable."[83] As a result, Premier removed citations for "Commercial Vehicles, Play Yard Equipment and Operating a Business" from the Vesters' "owner record."[84]

### b. Violations Alleged After June 2011

#### i. Plantings in the Common Area

Before the Vesters purchased their home in Henlopen Landing, several small, shrub-like trees had been planted in front of the home, in an area between the street and the sidewalk.[85] When the Vesters moved in, the trees were dead.[86] This area, the Vesters concede, is considered part of the "common area" of Henlopen Landing.[87] After moving in, and around December 2010, the Vesters replaced some of the small, dead trees with new, live trees.[88] The Association considered the planting of these trees to be a violation of the Declaration.[89] Prior to January of

---

[83] JX 9. Every homeowner in Henlopen Landing is an "Owner Member." JX 26, Art. I, Definitions "Owner;" JX 26, § 3.1.
[84] JX 9.
[85] Trial Tr. 127:13–23 (JaKara Vester).
[86] *Id.* at 127:17–23.
[87] Trial Tr. 175:21–176:14 (JaKara Vester); *id.* at 222:2–10 (Russell Vester).
[88] *Id.* at 127:24–128:18 (JaKara Vester).
[89] Verified Pet. for Enforcement of Recorded Restrictions, ¶¶ 20–23.

15

2012, the Vesters were unaware that the plantings were considered to be in the common area of Henlopen Landing and that the Association considered the plantings to be a violation of the Declaration.[90] The Vesters removed the plantings before August 22, 2012.[91]

## ii. Placement of Garbage Receptacles

The Declaration dictated that "garbage receptacles" be stored either within a homeowners' garage or "at the front of the dwelling in an enclosure approved by the Developer or Association and placed adjacent to the driveway for the dwelling in a location approved by the Developer or Association."[92] Prior to January of 2012, the Vesters were unaware that the placement of their trash cans was in violation of the Declaration.[93] After January 2012, the Vesters stored their trash cans in several locations, in an attempt to satisfy the Association; all were considered by the Association to be in violation of the Declaration.[94] In 2016, the Vesters built an enclosure for their trash cans, which the Association considers appropriate.[95]

## 2. The Vesters' Driveway Modification and Loss of Pool Access

While the Vesters may not have been aware of Association's position that their plantings and their placement of garbage receptacle were considered violations,

---

[90] APTSO ¶ 39; Trial Tr. 178:5–16 (JaKara Vester).
[91] APTSO ¶ 37.
[92] JX 26, § 8.15.
[93] APTSO ¶ 38; Trial Tr. 183:18–184:3 (JaKara Vester).
[94] Trial Tr. 131:19–132:14, 133:2–134:15 (JaKara Vester).
[95] *Id.* at 223:3–224:23 (Russell Vester).

the Vesters were aware that the Association considered the driveway modification to be non-compliant. On August 4, 2011, the same day the Vesters altered their driveway, the Vesters' pool key card, which gave them access to the community pool at Henlopen Landing, was disabled.[96] The decision was made by the Association, and performed by Premier.[97] The Association (through Premier) informed the Vesters that suspension of their pool access was in response to the Vesters' alteration of their driveway without prior approval.[98]

Mrs. Vester discovered that her pool access had been deactivated when she and her family attempted to enter the pool area a few days after August 4, 2011.[99] Mrs. Vester understood the reason given for the pool access deactivation was the Vesters' driveway modification,[100] but believed she had obtained the requisite approval for the driveway modification because of, among other things, her communication with Premier that her requests had been "approved."[101] Mrs. Vester also believed that Premier (and the Association) had received her contractor's second proposal, which she believed satisfied the ARB's concerns on drainage.[102] There is no evidence, however, that such was the case.

---

[96] APTSO ¶ 33.
[97] *Id.* ¶ 44.
[98] *Id.* ¶ 35.
[99] Trial Tr. 111:12–112:14 (JaKara Vester).
[100] *Id.* at 111:12–17, 114:21–116:10.
[101] JX 15, at 2–3; *see also* Trial Tr. 115:7–117:2, 118:10–16 (JaKara Vester); JX 88.
[102] Trial Tr. 118:10–13 (JaKara Vester).

17

Premier, under instruction from the Association, did not reactivate the Vesters' pool access, despite the Vesters' requests.[103] Mrs. Vester e-mailed Premier and made several visits and calls to their office.[104] She sent an August 10, 2011 e-mail, in which Mrs. Vester detailed her frustration with Premier and the Association, the efforts she had taken to reactivate her pool access, the reasons she believed that her driveway modification had been previously approved, and the importance of pool access to her special needs child.[105] Mrs. Vester concluded the e-mail by stating that if her pool access was not reactivated and her concerns not addressed, she "will be forced to seek the advice of an attorney."[106]

Ultimately, the Vesters' pool access and key card were not restored until August 17, 2014, which represents a period of over three years without access.[107]

*E. The Vesters and the Association Both Seek Recourse*

#### 1. The Vesters' Complaint with Delaware Division of Human Resources

On November 23, 2011, the Vesters filed a *pro se* complaint with the Delaware Division of Human Resources (the "DDHR") against the Association, alleging housing discrimination.[108] The DDHR then prepared a complaint it sent to

---

[103] APTSO ¶¶ 33, 36, 44.
[104] Trial Tr. 114:21–119:16 (JaKara Vester); *see also* JX 88.
[105] JX 88.
[106] *Id.* at 3.
[107] APTSO ¶ 36.
[108] JX 22.

18

the Association on December 21, 2011, accompanied by a questionnaire that the Association was required to fill out.[109] The Association completed its response to the questionnaire on January 13, 2012.[110] The Vesters received the Association's response in January of 2012, and at that time learned that the Association considered the Vesters to be in violation of the Declaration because of the plantings and the garbage receptacles, in addition to their driveway.[111] The record produced at trial does not indicate how the DDHR investigation was resolved.

### 2. The Association Initiates Litigation in the Court of Chancery

Prior to October 12, 2011, the Association's counsel had already begun drafting a complaint against the Vesters.[112] On February 7, 2012, the Association filed a Complaint against the Vesters in the Court of Chancery.[113] The Association brought three counts for violations of the recorded restrictions in the Declaration, and sought injunctive relief.[114] The three violations were for the driveway, the plantings, and the trash cans.[115] As described, these violations have been resolved. On August 15, 2017, the Association's claims were dismissed as moot, following Oral Argument on the Vesters' Motion for Summary Judgment on the same day.[116]

---

[109] JX 23.
[110] JX 25, at HL000724.
[111] Trial Tr. 129:13–20, 178:5–16, 183:18–184:3 (JaKara Vester).
[112] JX 81, at HL000849.
[113] *See* D.I. 1, Verified Petition for Enforcement of Recorded Restrictions.
[114] *Id.*
[115] *Id.*
[116] D.I. 147.

19

*F. Evidence in the Record of Discriminatory Intent*

The gravamen of the Vesters' Amended Counterclaim is that they have been discriminated against by the Association and the other homeowners of Henlopen Landing. The body of evidence supporting this claim comes almost entirely from Mrs. Vester's testimony. Mrs. Vester testified that other homeowners in Henlopen Landing or employees of Premier made comments to her indicating that "some people" in Henlopen Landing believed it "should be like a retirement community,"[117] that she was told that she "should be on a cul-de-sac if [she has] kids,"[118] and that she received violation notices initiated by the complaints of other homeowners because, according to Mrs. Vester, those homeowners did not like children, and/or did not approve of interracial marriage and biracial children.[119] Mrs. Vester's testimony as to those statements was not supported by the testimony of others (or record evidence), including, in some cases, those who she stated shared such comments with her.[120]

*G. The Association and the Vesters' Currently*

The Association concedes that the Vesters are currently in compliance with the Declaration and by-laws governing Henlopen Landing.[121] As mentioned, the

---

[117] Trial Tr. 92:18–93:4 (JaKara Vester).

[118] *Id.* at 95:12–19.

[119] *Id.* at 117:3–118:9.

[120] *See id.* at 206:16–207:4 (Larry Hofer); *id.* at 53:17–54:5 (Jami Harrigan-Faro); *id.* at 293:12–294:21 (Jeffrey Rice).

[121] *See, e.g.*, Pet'r's Opening Br. in Support of its Fee Application, at 1–2.

Vesters' pool access was restored on August 17, 2014. However, the Vesters never constructed a fence enclosing their backyard. They still desire to construct a six-foot-tall fence that enclose the side door of their garage. The record does not reflect why the fencing that was approved to accommodate ZaKai was not built. Since their request to extend the fence was denied, the Vesters have provided additional information regarding ZaKai's disability to the association.[122]

*H. Procedural History*

The procedural history of this case is long; interested readers should consult the docket. Suffice it to say, this action began with the Association's Petition, filed on February 7, 2012. The action was removed to Federal Court and then remanded (to this Court).[123] After more than seven years (and a Master's report, exceptions to the Master's report, motion practice, and judicial mediation),[124] trial was held on February 19, 2019 on only the Vesters' counterclaims (which added Premier as a party to this litigation). The Petitioner's claims, as mentioned, have been mooted.

## II. ANALYSIS

My discussion is below. I note that there are a number of inconsistencies between the allegations of the Amended Counterclaim, the pretrial stipulation, and the post-trial briefing. In an attempt to address the Counterclaim-Plaintiffs' claims

---

[122] *See, e.g.*, JX 33.
[123] *See* D.I. 8; D.I. 9.
[124] *See* D.I. 61; D.I. 86; D.I. 129; D.I. 150.

21

comprehensively and efficiently, my analysis is organized by the three alleged

statutory violations (each alleging a corresponding violation of both the Federal and

Delaware Fair Housing Acts)[125] as set forth in the Amended Counterclaim. With

respect to each, I set out the statutory elements of the claims as the parties have

stipulated in the pretrial order.[126] I then address the arguments of the parties

regarding the evidence of record as set out in the post-trial briefing, and then, to the

extent necessary, any other allegations to the extent not waived.

*A. Intentional Discrimination*

In Counts I and IV of their Amended Counterclaim, the Vesters allege that the

Association and Premier have intentionally discriminated against them based on

their race, their familial status, and their child's disability, in violation of State and

Federal Fair Housing law.[127] To establish a *prima facie* case of intentional

---

[125] The Vesters bring various claims against the Association and Premier under both the Delaware and Federal Fair Housing statutes. These statutes, to a large extent, mirror one another. Therefore, I discuss the alleged violation of analogous provisions together. *See Newark Landlord Ass'n v. City of Newark*, 2003 WL 21448560, at *9 (Del. Ch. June 13, 2003).

[126] The parties have agreed on the elements that the Counterclaim-Plaintiffs need to establish for each violation of the FHA. APTSO, Ex. A. I have accepted this stipulation, without independently confirming its accuracy.

[127] According to 42 U.S.C. § 3604(b), "it shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin. According to 42 U.S.C. § 3604(f)(2), "it shall be unlawful to . . . [t]o discriminate the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available." According to 6 Del. C. § 4603(b)(2), "it shall be unlawful . . . [t]o discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, national origin,

22

discrimination the Vesters must prove that a similarly situated party, during a similar time period, was treated differently by the Association (or Premier), and that this disparate treatment was due, in part or in whole, to discriminatory intent.[128] Discriminatory intent, in turn, may be shown through either direct or circumstantial evidence.[129] If circumstantial evidence is employed, the *McDonnell Douglas* burden shifting framework is employed, whereby: the Vesters must show the Counterclaim-Defendants acted with discriminatory animus towards them; which shifts the burden to the Defendants to show that acts were taken with a non-discriminatory interest; which would again shift the burden to the Vesters to show that alternative practice was available, which has a less disparate impact and meets the legitimate needs of the Defendants.[130]

### 1. The Suspension of the Vesters' Pool Access

The only discriminatory act to which the Vesters point in post-trial briefing is the suspension of their access to the community pool. It is clear that for three years, the Vesters' access card was disabled, and thus the Counterclaim-Defendants treated the Vesters differently than other property owners, who had use of the pool.

---

religion, creed, sex, marital status, familial status, source of income, age, sexual orientation, gender identity or disability."
[128] APTSO, Ex. A., at 1.
[129] *Id.*
[130] *Id.*

23

However, the Vesters have failed to show that their use of the pool was suspended because of their race, familial status, or disability (or other impermissible criteria).

The Vesters applied to the ARB for permission to alter their driveway. Such alteration, per the Declaration, requires written permission of the ARB. Driveway alteration can affect storm water drainage. Such an action therefore requires "a certification of non-effect of said plans" on drainage from a professional engineer licensed in the State of Delaware.[131] The Vesters' application, however, did not attach such a certificate, nor did it even contain a statement from the contractor addressing drainage. I note that the record suggests that the ARB has been inconsistent on what it has required regarding proof that a driveway alteration will not affect drainage, from nothing, to a statement by the contractor. After the ARB considered the Vesters' application, it deferred the matter, and requested "a plan from the contractor indicating the slope of the driveway is interior, not exterior."[132] There is no evidence that this request was made as a result of invidious discrimination, and I find the request itself was not discriminatory.

The Vesters obtained a plan from their contractor that appeared to satisfy the condition of the ARB, but I find that a copy of the plan was never given to the ARB. Mrs. Vester did inform Ms. Roach at Premier that her review of the paving proposal

---

[131] JX 26, § 7.3.
[132] JX 14.

24

indicated that the grading would be "interior" and that she had asked the contractor to "make that clear,"[133] information that Ms. Roach agreed to pass on to the ARB, but it has not be shown that the actual plan was given to the ARB (or Premier). Nonetheless, a week later, Mrs. Vester inquired of Ms. Roach about the status of the applications (which included the fence, gazebo, and water well applications as well as the driveway alteration; some of which had already been approved), and Ms. Roach responded "all has been approved." This was an error—in fact, the ARB had not approved the driveway.

Relying on the email from Ms. Roach—and without the written permission of the ARB as required by the Declaration—the Vesters had their contractor alter the driveway two weeks later on August 4, 2011. It was in this context that the Vesters were denied use of the pool by Association. The Vesters were informed that their common area access was cut off because they had altered the driveway without the prior approval of the ARB. Shortly thereafter, on August 10, 2011, Mrs. Vester informed Premier that if her family's access was not restored, she would consult an attorney. On August 22, 2011, the Association demanded a professional engineer's certification on drainage before approving the driveway alteration. Such a certification is required in the Declaration, but had not been required of other residents altering driveways. A year would pass before the Vesters complied.

---

[133] JX 15.

Because this is a statutory discrimination claim, I need not determine who was at fault for the series of misunderstandings here. Premier told the Vesters that "all" their requests had been granted by the ARB. This was untrue, but was relied upon by the Vesters. The Declaration, however, required written authorization from the ARB before driveway alteration could commence, and the ARB had informed the Vesters that it would not consider the request without a contractor's statement that drainage would be "interior," a statement that, I find, it did not receive before the Vesters' contractor altered the driveway. Once Mrs. Vester threatened legal action, the ARB insisted on a professional engineer's report on drainage, in compliance with the Declaration but not consistent with prior practice with other homeowners. In this context, the pool access was cut off. This was a coercive action specifically contemplated by the Declaration.[134]

In other words, I find that the denial of common-area access was not based on racial, familial status, or disability discrimination. It was instead part of a dispute over the Vesters' alteration of their driveway without written approval of the ARB. The actions of the Association may appear excessive and petty, and denial of pool access continued after the time permitted by the Declaration. But I find that the

---

[134] Access was denied long after the professional engineer's report was provided to the Association, which is not consistent with the Declaration.

Association and Premier were not motivated by discrimination as defined by the statutes.

Mrs. Vester attempted to bolster her contention that invidious discrimination was at work by pointing to hearsay (and double hearsay) statements indicating that homeowners within the Henlopen Landing held discriminatory animus toward children and interracial couples. The statements, however, were made in the context of the violation notices based only on the complaints of other homeowners, which the Vesters had received prior to June 2011. Even as described by Mrs. Vester, no specific statement pertained to the Association's decision to suspend the Vesters' pool access. Furthermore, Mrs. Vester's testimony was controverted by some of the same people whom she alleged made the statements at issue.

### 2. Violation Notices

The Vesters, in their post-trial briefing, focus exclusively on the suspension of pool access to show discrimination. In their Amended Counterclaim, the Vesters had contended that notice of violations given by Premier to the Vesters in the months *before* the driveway application was made were based on discriminatory animus held by other homeowners, causing those homeowners to make spurious complaints to Premier, which caused Premier to issue the violation notices to the Vesters.[135] Because this theory was not addressed in briefing, I consider it waived. In any event,

---

[135] Resp'ts' Am. Answer, Defenses and Countercls., Countercls., ¶¶ 44, 52.

the Vesters point to no evidence that Premier was acting with discriminatory intent with respect to these notices, which were resolved between Premier and the Vesters amicably by removing the notices from the Vesters' record.

*B. Reasonable Accommodation*

In Counts II and V of their Amended Counterclaim, the Vesters claim that the Association denied them "reasonable accommodation" under State and Federal Fair Housing law because of their child's disability.[136]  Specifically, they point to the ARB's denial of a request to extend a fenced-in yard to include the side door to the garage, which would serve to accommodate the need to monitor their autistic son, ZaKai.  To establish a failure to provide a reasonable accommodation, the Vesters must prove: (1) they or someone in their household is a person with a disability; (2) the Association knew or reasonably should have known that the Vesters or someone in their household is a person with a disability; (3) the Vesters requested a reasonable accommodation in the rules, policies, practices, or services of the Association; (4) the requested accommodation is necessary to afford the Vesters an equal opportunity to use and enjoy their dwelling; and (5) the Association refused the Vesters' request

---

[136] According to 42 U.S.C. § 3604(f)(3)(B), "For the purposes of this subsection, discrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  According to 6 Del. C. § 4603A(a)(2), "[D]iscrimination on the basis of a individual's disability includes . . . [a] refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

28

to make an accommodation, or failed to respond or delayed responding to the request such that it amounted to a denial.[137]

Per the Vesters, they wished their son to have access to his toys in the garage and at the same time have access to the backyard, which needed to be fenced because he is an elopement risk due to his autism. The Vesters allege that their request to extend their proposed fence to encompass the side door of their garage for this purpose sought a reasonable accommodation, and the denial of the accommodation by the Association was therefore discriminatory. The Vesters have, however, failed to prove, at least, one of the necessary statutory elements; that they *requested* a reasonable accommodation from the Association.

In their initial request to the ARB, the Vesters indicated that they sought a height variance, from four to six feet, for the fence to accommodate the needs of their son, who, they averred, could scale a four foot fence. *The ARB granted that request.* They also sought a variance to the *placement* of their proposed fence, in order to extend the fenced yard toward the front of the property to encompass the side garage door. Such a variance was necessary, presumably, because the setback requirements for fencing in the Declaration only allow fencing to the midpoint of

---

[137] APTSO, Ex. A, at 3–4.

the side of the house.[138]  According to Mrs. Vester, whose testimony I accept, her intent in making this request was to accommodate ZaKai's autism, as described above.  *However, this was not what she initially told the ARB in her written request*. To the contrary, she told the ARB that she wanted to allow her dog to come in from the back yard through the garage, to keep the living areas clean.  This was the rationale initially presented to the ARB, *not* the special needs of the Vesters' child. When this request was denied, the Vesters asked for reconsideration.  In their written request for reconsideration, they still maintained the pretextual rationale regarding their pet, and added the reasoning that a fence extension would enclose the controls to their sprinkler system and prevent vandalism.  Again, the rationales presented to the ARB in the Vesters' written requests for the fence extension were pretext, and the Vesters did not request an accommodation for the special needs of their child. The request for reconsideration was not granted by the ARB.  Because the Vesters did not request an accommodation for their son's autism, the accommodation claim under the Fair Housing Acts must fail.

The Vesters never explain why they did not state in their applications to the ARB that the fence-extension request was to accommodate ZaKai's special needs. The ARB was aware of their child's special needs, because the Vesters requested a

---

[138] I need not resolve the deed restriction issue here, but I note that the fencing restriction is ambiguous.  I also note that no scale drawing or other cognizable evidence gives me the dimensions of the house and yards at issue.

variance of the permitted height of a fence on that same ground. This height variance was granted, and was granted explicitly to accommodate their child's needs.

I do not know the Vesters' rationale for disclosing the need for an accommodation for fence height, but not disclosing the true purpose for the extent of the fence in their written variance applications. They may well have believed that their actions were in the interests of their family, in a way not obvious to me. But they cannot base a reasonable accommodation claim on the ARB's denial of the fence extension, under these circumstances. Nothing herein relieves the ARB from addressing the Vesters current fence variance request, an issue addressed below.

*C. Retaliation*

Finally, in Counts III and VI of the Vesters' Counterclaim, the Vesters allege that the Association has retaliated against them for attempting to exercise or enjoy their rights under State and Federal Fair Housing Acts. Such retaliation would violate the Acts.[139] To prevail on this claim, the Vesters must show: (1) someone in their household is a member of a protected class, (2) they enjoyed a protected right, (3) the conduct by the Association was motivated, at least partially, by

---

[139] According to 42 U.S.C. § 3617, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." According to 6 Del. C. § 4618, "It shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by § 4603, § 4604, § 4605 or § 4606 of this title."

intentional discrimination, and (4) the Association coerced, threatened, intimidated, or interfered on the account of the Vesters' exercising their protected right.[140] The Vesters, a mixed-race family with an autistic child, are members of a protected class. However, I do not find that the Association was motivated by discrimination, leading it to interfere with exercise of a protected right of the Vester's.

### 1. The Filing of this Action

The Vesters sought to exercise their rights under the Fair Housing Acts by bringing a complaint before the DDHR. The Vesters, in their Amended Counterclaim, suggest that the Association took two retaliatory actions, "raising unfounded concerns about the driveway alteration" and commencing this action. In Post-Trial briefing the Vesters focus their argument entirely on the Association's decision to bring an action in the Court of Chancery against them. [141]

The Vesters argue that the Association, by bringing this action, has unlawfully retaliated against them for exercising their rights under the fair housing laws by bringing their complaint with the DDHR. The Association would have become aware of the Vesters complaint to the DDHR when the DDHR provided it with the Vesters' complaint on December 21, 2011. By the Vesters' own admission counsel

---

[140] APTSO, Ex. A, at 5.

[141] By not arguing that they have demonstrated actionable retaliation relating to the driveway alteration in post-trial briefing, I find, the Vesters have waived the argument that the Association's actions regarding the driveway alteration are retaliatory in violation of the Fair Housing Acts. In any event, for reasons explained at length above, I do not find the denial by the ARB of the request to alter the driveway was motivated, in part or whole, by intentional discrimination.

for the Association had begun drafting their Petition against the Vesters at least as far back as October 2011.[142] While the Association's Petition was not filed until February 7, 2012, preparation had begun *before* the Association was aware that the Vesters had filed their own complaint with the DDHR. The Association's Petition sought to enforce three restrictive covenants, related to the Vesters' driveway, the plantings, and the placement of garbage receptacles.

The Vesters were aware that the Association considered their driveway, as altered, to be non-compliant, however, the Vesters allege that they had received approval (evidenced by the email from Premier) for the work, and that the Association's allegations of non-compliance were pretextual and discriminatory. The Vesters also, I assume, believed they would be vindicated through their DDHR complaint.[143] From the perspective of the Association, however, the Vesters had violated the Declaration by submitting an incomplete application for driveway alteration, and by altering the driveway without the written permission of the ARB. I find no evidence that the Association's motivation in this action to enforce the Declaration regarding the Vester's driveway alteration is pretextual or motivated, in part, by discrimination, or is in retaliation for the exercise of the Vesters' rights under the Fair Housing Acts. To the contrary; I find the action was brought because from

---

[142] Countercl. Pl.'s Post-Trial Closing Arg., at 20.
[143] The record at trial appears to be silent as to the outcome of the Vesters' complaint before the DDHR.

the point of view of the Association, the Vesters had responded to the ARB's request for more information regarding drainage with a self-help construction of the altered driveway, creating a *fait accompli* and denying the ARB the opportunity to fulfil its duty under the Declaration. It is worth noting that there is no evidence, or even suggestion, that the litigation in this Court was an attempt by the Association to coerce the Vesters into dropping their DDHR complaint.[144] The Association's complaint that the Vesters were in violation of the Declaration with respect to the driveway, I find, was brought in good faith, not for reasons of discrimination or wrongful retaliation.

The Vesters point out that the Association included in their Complaint allegations that the Vesters were in violation of the Declaration in two additional ways. First, the Complaint included the allegation that the Vesters were not keeping their trash cans in the garage or in an enclosure, in violation of the Declaration. This was, in fact, true, and the Vesters have since constructed a compliant enclosure for the trash cans. Second, the Association alleged that the Vesters had placed small trees in the common areas, also in violation of the Declaration. Again, this was true. The Vesters have caused the trees to be removed. These allegations of the Complaint have been vindicated, and the requests for relief from the violations mooted.

---

[144] *See* 42 U.S.C. § 3617.

The two allegations were also picayune and petty. The Vesters did not receive violation notices prior to the Association bringing this litigation, which might have avoided the need for these counts being part of the Petition. The record, I note, indicates that the Association had not previously brought legal action to enforce the Declaration against *any* homeowners, and certainly not before providing notice to the homeowner of a violation. While the inclusion in the Petition of the driveway alteration was substantive and reasonable, the allegations regarding the tree planting and trash can storage appear to be an attempt to lard the complaint with minutiae, as a hard litigation tactic. The record does not suggest it is more than that, however. I do not find adding these claims was in part retaliatory for the exercise of rights under the Acts, or based on discrimination because of race, family or disability.

### 2. Other Basis for a Retaliation Claim

The Vesters claim that the ARB's driveway concerns were unfounded, and were simply a way to harass the Vesters in retaliation for their request for a fence-location variance for their child. This claim fails, I find, for several reasons. I have explained above that there was a good-faith reason for the ARB's request for drainage information before permitting the driveway alteration. This retaliation claim must fail for another reason: *the ARB granted the request for a fence variance to the extent the Vesters sought an accommodation for their son's special needs.*

There is simply no basis to find that the ARB refused an accommodation, let alone that it retaliated for the mere request for an accommodation.

*D. Remaining Issues*

The Association seeks a mootness fee for obtaining compliance with the deed restrictions of the Declaration, with respect to the driveway, the tree plantings and the trashcan storage. They claim to be entitled to recover legal fees from the Vesters under 10 Del. C. § 348(e) (as well as 25 Del. C. § 81-417(a)). The Vesters, I note, did not seek contractual, as opposed to statutory, damages for the wrongful continued denial of pool access (that is, denial more than 90 days after the Vesters provided the requested professional engineer's report). It is unclear, however, if the Vesters seek to offset any contractual damages against any fee the Association may recover under Section 348. Finally, the Vesters still seek an accommodation for their child's autism in the location of the fence, the ARB should act on this request promptly, based on the Vesters' true reason for applying for the variance, as an accommodation for their child's disability, as well as the information submitted by the Vesters since the variance was denied. I retain jurisdiction to oversee this request.

## III. CONCLUSION

The Vesters have failed to show a basis for their State and Federal Fair Housing Claims. The parties should confer and inform me of how the remaining

36

issues should be addressed, and provide an appropriate form of order concerning the

statutory claims, consistent with this Memorandum Opinion.